## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

IN RE APPLICATION OF
NBCUNIVERSAL MEDIA, LLC TO
PERMIT VIDEO AND AUDIO
OF TRIAL PROCEEDINGS IN
UNITED STATES V. DONALD TRUMP

Case: 1:23−mc−00107
Assigned To : Chutkan, Tanya S.
Assign. Date : 10/11/2023
Description: Misc.

Hearing Requested

## APPLICATION OF NBCUNIVERSAL MEDIA, LLC TO PERMIT VIDEO AND AUDIO OF TRIAL PROCEEDINGS IN UNITED STATES V. DONALD TRUMP

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC
2023 OCT 11 P 5:10
RECEIVED



RECEIVED
Mail Room
OCT 1 2 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# TABLE OF CONTENTS

INTEREST OF THE APPLICANT ................................................................................. 1

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 5

ARGUMENT ............................................................................................................... 6

    I.   This Court has authority to allow video and audio coverage of trial proceedings, including prompt broadcasting from outside the courtroom. ....................................... 6

        A.   Rule 53 does not prohibit the Court from allowing out-of-courtroom video and audio broadcasts of this trial to the public. ............................................. 6

        B.   Rule 53 and the Court Reporter Act authorize the Court to create a video and audio recording of trial proceedings. ................................................... 11

        C.   The canon of constitutional avoidance supports NBCU News Group's interpretation. ................................................................................... 15

    II.  A ban on creating and disseminating video and audio of criminal trials would be a content-based restriction that, as applied here, cannot satisfy strict scrutiny. ........... 16

        A.   A ban on creating and disseminating video and audio of criminal trials is a content-based restriction. ..................................................................... 17

        B.   As applied here, a ban on creating and disseminating video and audio of this criminal trial does not satisfy strict scrutiny. ........................................ 22

    III. At minimum, Rule 53 is a time, place, and manner restriction that does not satisfy intermediate scrutiny as applied here. ............................................................ 29

    IV. The Court should exercise its discretion to permit video and audio coverage of this historic trial. ................................................................................................... 31

CONCLUSION AND PRAYER FOR RELIEF ................................................................. 33

## TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996)...................................................................................................21

*ABC, Inc. v. Stewart,*
  360 F.3d 90 (2d Cir. 2004)........................................................................................19

*Agudas Chasidei Chabad of United States v. Russian Federation,*
  19 F.4th 472 (D.C. Cir. 2021)......................................................................................7

*American Civil Liberties Union of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012).....................................................................................18

*Anderson v. Bessemer City,*
  470 U.S. 564 (1985)...................................................................................................19

*Bittner v. United States,*
  598 U.S. 85 (2023).....................................................................................................12

*Bose Corp. v. Consumers Union of United States, Inc.,*
  466 U.S. 485 (1984)...................................................................................................21

*Capitol Records, Inc. v. Alaujan,*
  593 F. Supp. 2d 319 (D. Mass. Jan. 14, 2009)..........................................................26

*\*Chandler v. Florida,*
  449 U.S. 560 (1981)................................................................................................9, 23

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010).............................................................................................18, 32

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S. Ct. 1464 (2022)...............................................................................................20

*Conway v. United States,*
  852 F.2d 187 (6th Cir. 1988).....................................................................................22

*State ex rel. Cosmos Broadcast. Corp. v. Brown,*
  471 N.E.2d 874 (Ohio Ct. App. 1984)......................................................................24

*Counterman v. Colorado,*
  600 U.S. 66 (2023)...............................................................................................17, 31

*Craig v. Harney,*
  331 U.S. 367 (1947)............................................................................................12, 32

*Dep't of Homeland Security v. MacLean,*
  574 U.S. 383 (2015)...................................................................................................12

*Diehl v. Commonwealth,*
  385 S.E.2d 228 (Va. Ct. App. 1989) .............................................................. 24

*Dish Network Corp. v. Arrowood Indem. Co.,*
  772 F.3d 856 (10th Cir. 2014) ......................................................................... 7

*United States ex rel. Eisenstein v. City of New York,*
  556 U.S. 928 (2009) ........................................................................................ 8

*Estes v. Texas,*
  381 U.S. 532 (1965) .......................................................................... 9, 23, 31

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .................................................................................. 6, 15

*Fed. Express Corp. v. United States Dep't of Commerce,*
  39 F.4th 756 (D.C. Cir. 2022) ................................................................... 6, 15

*Hollingsworth v. Perry,*
  558 U.S. 183 (2010) ...................................................................................... 14

*Hustler Mag., Inc. v. Falwell,*
  485 U.S. 46 (1988) ................................................................................... 21, 31

*Initiative and Referendum Inst. v. U.S.P.S.,*
  417 F.3d 1299 (D.C. Cir. 2005) .................................................................... 30

*Janus v. American Fed. of State, County, and Mun. Employees, Council 31,*
  138 S. Ct. 2448 (2018) .................................................................................. 25

*Johnson v. United States,*
  544 U.S. 295 (2005) ........................................................................................ 8

*Jones v. Hendrix,*
  599 U.S. 465 (2023) ........................................................................................ 8

*\*Katzman v. Victoria's Secret Catalogue,*
  923 F.Supp. 580 (S.D.N.Y. 1996) ........................................................ 21, 23, 24

*In re Mack,*
  126 A.2d 679 (Pa. 1956) .................................................................................. 9

*Marisol A. v. Giuliani,*
  929 F. Supp. 660 (S.D.N.Y. 1996) ................................................................. 21

*\*McCullen v. Coakley,*
  573 U.S. 464 (2014) ........................................................................... 21, 22, 27

*Mills v. Alabama,*
  384 U.S. 214 (1966) ...................................................................................... 17

*In re Motions of Dow Jones & Co.,*
  142 F.3d 496 (D.C. Cir. 1998) ...................................................................... 10

iii

*Ness v. City of Bloomington,*
    11 F.4th 914 (8th Cir. 2021) ............................................................................18

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .........................................................................................17

*Nixon v. Warner Commc'ns, Inc.,*
    435 U.S. 589 (1978) .........................................................................................13

*In re Order Extending Use of Video and Telephone Conferencing Under Exigent Circumstances,*
    2021 WL 1165147 (D. Vt. Mar. 26, 2021) ......................................................26

*Pavelic & LeFlore v. Marvel Ent. Grp.,*
    493 U.S. 120 (1989)............................................................................................7

*People v. Santiago,*
    712 N.Y.S.2d 244 (N.Y. Monroe Co. 2000) ....................................................24

*Perry v. Newsom,*
    18 F.4th 622 (9th Cir. 2021) ............................................................................14

*Petition of Post-Newsweek Stations, Fla., Inc.,*
    370 So. 2d 764 (Fla. 1979)........................................................................27, 33

*Press-Enterprise Co. v. Superior Court,*
    464 U.S. 501 (1984) (*Press-Enterprise I*)....................................................12, 33

*Press-Enterprise Co. v. Superior Court,*
    478 U.S. 1 (1986) (*Press-Enterprise II*) ......................................................12, 13

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)................................................................................16, 20, 22

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980) ....................................................................................12, 17

*Sandvig v. Barr,*
    451 F. Supp. 3d 73, 89 (D.D.C. 2020) ............................................................15

*In re Schoenfield,*
    608 F.2d 930 (2d Cir. 1979)..............................................................................30

*In re Sentencing,*
    219 F.R.D. 262 (E.D.N.Y. 2004) ....................................................................14

*Shabazz v. Lynaugh,*
    974 F.2d 597 (5th Cir. 1992) ............................................................................11

*Smith v. U.S. Dist. Court Officers,*
    203 F.3d 440 (7th Cir. 2000) ............................................................................13

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)....................................................................................20, 22

iv

*State v. Arias,*
    462 P.3d 1051 (Ariz. Ct. App. 2020)................................................................24

*State v. Smart,*
    622 A.2d 1197 (N.H. 1993)..............................................................24, 27

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994)..........................................................................29, 31

*United States v. Allen,*
    34 F.4th 789 (9th Cir. 2022) ...............................................19, 26, 30, 31

*United States v. Barrow,*
    2021 WL 3602859 (D.D.C. Aug. 13, 2021) ....................................26

*United States v. Cannon,*
    987 F.3d 924 (11th Cir. 2021) ......................................................11

*United States v. Cicilline,*
    571 F. Supp. 359 (D.R.I. 1983).......................................................9

*United States v. Edwards,*
    785 F.2d 1293 (5th Cir. 1986) .......................................................22

*United States v. Hansen,*
    143 S. Ct. 1932 (2023)..............................................................15, 16

*United States v. Hastings,*
    695 F.2d 1278 (11th Cir. 1983) .........................................20, 22, 23, 29

*United States v. Hubbard,*
    650 F.2d 293 (D.C. Cir. 1980)........................................................13

*United States v. Kerley,*
    753 F.2d 617 (7th Cir. 1985) ....................................................22, 29

*United States v. McVeigh,*
    931 F. Supp. 753 (D. Colo. 1996)...................................................14

*United States v. Poindexter,*
    732 F. Supp. 165 (D.D.C. 1990) ................................................18, 28

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)....................................................................29, 30

*Warger v. Shauers,*
    574 U.S. 40 (2014).........................................................................7

*Washington Post v. Robinson,*
    935 F.2d 282 (D.C. Cir. 1991) ......................................12, 17, 28, 33

*Weaver v. U.S. Info. Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) .......................................................15

*In re WMUR Channel 9,*
  813 A.2d 455 (N.H. 2002) .......................................................................................... 30

*In re Zyprexa Prods. Liab. Litig.,*
  2008 WL 1809659 (E.D.N.Y. Mar. 4, 2008) ............................................................. 26

**Statutes**

15 U.S.C. § 15002 ............................................................................................................ 26

*28 U.S.C. § 753 ............................................................................................... 6, 11, 14, 16

**Rules**

Fed. R. Crim. P. 5.1 ....................................................................................................... 12

Fed. R. Crim. P. 6 .......................................................................................................... 10

*Fed. R. Crim. P. 53 ............................................................... 4, 6, 7, 8, 10, 11, 14, 16

Fed. R. Crim. P. 53 (1944) ............................................................................................... 8

Fed. R. Crim. P. 58 ......................................................................................................... 12

Loc. Civ. R. 83.1 ............................................................................................................ 19

Loc. Crim. R. 302 .......................................................................................................... 10

Loc. Crim. R. 53.1.1 ............................................................................................. 11, 13, 19

Loc. Crim. R. 57.6 ............................................................................................................ 1

**Other Authorities**

"Broadcast," *Merriam-Webster,* https://tinyurl.com/yeyrcdt5 ........................................ 7

District Court Media Room, U.S. District Court for the District of Columbia,
  https://tinyurl.com/2ndrbyxf ...................................................................................... 10

*Hearing before the Committee on the Judiciary House of Representatives,*
  110th Cong. on H.R. 2128 (2007) .............................................................................. 24

Jozsef Papp, *Fulton judge says Trump court proceedings will be televised,*
  Atlanta Journal-Const. (Aug. 31, 2023), https://tinyurl.com/53sm9ntd .................... 25

Matt Sepic, *Chauvin trial eases concerns of courtroom camera skeptics,*
  MPR News (Apr. 29, 2021), https://tinyurl.com/bdwd4rcu ....................................... 25

*Nation Views Clinton's Taped Testimony Before Grand Jury,* L.A. Times
  (Sept. 22, 1998), https://tinyurl.com/2twswaus ......................................................... 17

*Presidential Grand Jury Testimony,* C-SPAN (Aug. 17, 1998),
  https://tinyurl.com/yjyyfeud; ..................................................................................... 17

Public and Media Advisory, U.S. District Court for the District of Columbia
(Aug. 10, 2023), https://tinyurl.com/2h7uwre9 ........................................................ 27

Sandra D. Jordan, *Classified Information and Conflicts in Independent Counsel Prosecutions: Balancing the Scales of Justice After Iran-Contra*, 91 Colum. L. Rev. 1651 (1991) ............................................................................................................ 18

*Trump lawyer: I personally want cameras in courtroom*, CNN (Aug. 6, 2023), https://tinyurl.com/ve94dvvh .................................................................................... 25

*US District Court Northern District of California*, YouTube, https://tinyurl.com/2p8ym664 ...................................................................................... 14

NBCUniversal Media, LLC, doing business as NBCUniversal News Group ("NBCU News Group"), respectfully submits this application under Local Criminal Rule 57.6 to request that this Court allow video and audio of the March 2024 trial of former President Donald J. Trump, either by a pool camera shared by NBCU News Group and other news organizations, or through the Court's own equipment.  Powerful First Amendment values and the extraordinary importance of these proceedings counsel strongly for this Court to exercise its discretion to authorize the public dissemination of the audiovisual record of these proceedings either in real time or at most with the limited delay necessary for the Court to assess whether significant public interests require the extraordinary relief of withholding any portion of these proceedings from the public.  NBCU News Group respectfully requests an oral hearing on this application.

## INTEREST OF THE APPLICANT

NBCU News Group is one of the world's leading news organizations.  NBCU News Group includes NBC News, MSNBC, CNBC, Telemundo, and NBC- and Telemundo local news stations. NBCU News Group is the most viewed news organization in the nation, reaching seven in ten American adults each month—172 million people across television, streaming news, and digital. Through these and other avenues for journalism, NBCU News Group reports on historic events like this trial and has a journalistic obligation to provide its viewers, the public at large, and future generations with the best possible record of these proceedings and other significant events like them.

## INTRODUCTION

The American public has an extraordinary interest in seeing and hearing this trial of former President Trump.  The indictment alleges that he "pursued unlawful means of discounting legitimate votes and subverting the election results" of the 2020 Presidential election—in other words, the indictment claims that, as the sitting United States President, Mr. Trump sought to

subvert the peaceful transfer of presidential power and the foundational principles of our nation's democracy.    These alleged efforts have been the subject of Congressional hearings and an impeachment proceeding—both of which were televised live.  Mr. Trump is a candidate for the Republican nomination to the presidency.  His trial in this case will be the subject of pervasive news coverage, real-time commentary from across the political spectrum—including perhaps from Mr. Trump himself—and countless conversations among American voters as the presidential primary elections unfold alongside the trial.  Yet, unless this Court permits it, only the very small number of people who can access the physical courtroom will ever be able to see and hear the trial for themselves, and everyone else will instead have to rely on second- and third-hand coverage and cold transcripts.  Civil and criminal proceedings *have been televised routinely* for decades pursuant to rules in many state courts, with no prejudice to any party or to the administration of justice.  If ever a trial were to be televised, this one should be, for the benefit of American democracy.

In the modern history of the United States, there are two prominent examples of a President testifying in criminal proceedings relating to their presidency—and both times, that testimony was captured on video and disseminated to the American people.  After leaving office, President Reagan sat for a videotaped deposition in the criminal prosecution of his former National Security Advisor related to the Iran-Contra investigation, and that deposition was then played during the trial in this courthouse.  A judge of this District ultimately ruled that the media and by extension the public would have access to the video of that testimony.  President Clinton, while still in office, testified by video feed before a grand jury—a proceeding that, unlike a criminal trial, is not presumptively open to the public—convened in this courthouse during the Independent Counsel's investigation that led to the President's impeachment.  Congress released the videotaped testimony

to the public a month later, and it was widely broadcast on network television in full. Granting access to that video and audio gave the American people the ability to assess the fairness of those proceedings, allowed them to view and evaluate the evidence related to matters of urgent public moment, enriched the public's understanding of those significant events, and preserved the record of those proceedings for posterity.

NBCU News Group brings this application to ensure that present and future American generations see and hear this even more momentous occasion—the first time any U.S. President, former or current, will go on trial as a federal criminal defendant. NBCU News Group agrees with the application filed by the Media Coalition that the First Amendment right of access to criminal trials requires audiovisual access under the extraordinary facts of this case. *In re Media Application for Audiovisual Access to Trial Proceedings In United States of America v. Donald J. Trump*, Case 1:23-mc-00099 (D.D.C. Oct. 5, 2023).[1] We file this separate application to emphasize different, additional considerations: why principles of statutory interpretation, the plain language of Rule 53, the doctrine of constitutional avoidance, and the distinct First Amendment rules governing content-based restrictions on speech all separately require audiovisual access to this proceeding. No compelling or substantial government interest supports restricting public access to a miniscule number of reporters and a handful of members of the public who can physically access the courtroom in Washington D.C. to see and hear what happens.

Vital public interests in democratic institutions and the freedom of speech are at the core of this application. But to grant this relief, the Court need only apply clear, everyday principles of statutory interpretation to determine that it already has authority to permit video and audio of these

---

[1] NBCU News Group respectfully requests that the Court consider its application and the Media Coalition's application at the same time. NBCU News Group and the Media Coalition will coordinate with counsel for the parties to arrange a consolidated briefing schedule for the respective applications.

proceedings.  Federal Rule of Criminal Procedure 53 prohibits broadcasting only "*from the courtroom*."  Rule 53 says nothing about permitting NBCU News Group and other media outlets to capture live video of the proceedings using a single pool camera, relay that feed to their studios, and then disseminate that feed to the public from their studios *outside* the courtroom.  Even if it did, Rule 53 plainly does not prohibit the *Court* from using its own equipment to provide a live feed of these recordings to NBCU News Group and other media outlets and authorize them to broadcast that live feed to the public from their studios outside the courtroom.  The Court Reporter Act also independently authorizes this Court to designate video or audio as the original record transcribing the trial.  Furthermore, nothing in Rule 53 precludes the Court from authorizing NBCU News Group and other outlets to use a single pool camera, or the Court's own equipment, to capture a video recording of this trial and to air it after a brief delay.  And if there is ambiguity as to whether Rule 53 allows the Court to authorize video and audio of this proceeding, the constitutional avoidance canon reinforces these interpretations because a ban on such video and audio would present serious First Amendment issues.

Indeed, if Rule 53 were construed to impose a complete ban on creating and disseminating audiovisual content of criminal trials, that ban would, as applied to this trial, violate the First Amendment.  Such a ban would rest on at least three content-based distinctions—(1) an express disfavoring of the content of video and audio that is necessarily not included in written transcripts, such as the appearance, tone, and demeanor of trial participants; (2) a stricter regulation for criminal proceedings than for civil proceedings and ceremonial events in courtrooms; and (3) an acknowledged governmental objective of preventing audiovisual coverage of trials due to concerns about how trial participants and the public will respond to that protected speech.  Such a ban would have to satisfy the strict scrutiny applicable to all content-based regulations.  And it could not meet

that standard: it serves no compelling government interest and manifestly is not the least restrictive means to serve any interest, given the abundant alternatives for this Court to manage concerns through tailored measures, as courts in most states do.

Moreover, a ban on creating and disseminating video and audio of this trial would violate the First Amendment even if it constitutes only a time, place, and manner restriction subject to intermediate scrutiny. The interests justifying such a flat ban are theoretical, not real: 46 states have allowed broadcasting of criminal trials, federal courts permitted limited live broadcasts of criminal trials during the COVID-19 pandemic, and the Supreme Court and federal courts of appeals regularly broadcast live audio or video of oral arguments on legal issues in criminal cases, providing the benefits of real-time public access with no evidence of adverse effects. And such a ban would also fail to leave open adequate alternatives for speech about the trial. A transcript is a categorically inadequate substitute for audiovisual coverage of this historic proceeding. The few circuits that in the past concluded that a categorical ban could survive intermediate scrutiny applied outdated First Amendment concepts and assumed that recording a criminal trial would involve disruption—a concern that is no longer plausible because of advances in audiovisual technology.

This Court has discretion to authorize video and audio coverage of this trial, either under Rule 53 and the Court Reporter Act, or else the First Amendment itself. The free-speech interests at stake in this case, which involve public interest and concern of the highest order, weigh heavily in favor of exercising that discretion to allow maximum public access to the first-ever trial of a former President.

## STATEMENT OF FACTS

On August 1, 2023, in connection with Special Counsel Jack Smith's investigation, the grand jury indicted former President Donald Trump on four felony counts for alleged conduct leading up and related to the January 6 Capitol insurrection and efforts to disrupt Congress's

5

official actions in the peaceful transfer of the power for the presidency. *United States v. Trump*, No. 23-cr-257-TSC, Dkt. 1. The indictment alleges that Mr. Trump "spread lies that there had been outcome determinative fraud in the election," created "an intense national atmosphere of mistrust and anger," and "pursued unlawful means of discounting legitimate votes and subverting the election results." *Id.* at 1–2. On August 28, 2023, this Court set trial to begin on March 4, 2024. *Id.*, Dkt. No. 39 at ¶ 1.

## ARGUMENT

**I.     This Court has authority to allow video and audio coverage of trial proceedings, including prompt broadcasting from outside the courtroom.**

This Court should grant NBCU News Group's application to create audiovisual coverage of the trial in this case. The Federal Rules permit such coverage, so long as NBCU News Group does not broadcast live from the courtroom. A federal statute, 28 U.S.C. § 753(b), also affirmatively authorizes the use of video or audio as the original record of a criminal trial. And if there were any doubt on either score, the canon of constitutional avoidance confirms NBCU News Group's reading because a complete ban on video and audio coverage would raise "serious constitutional doubts" under the First Amendment. *Fed. Express Corp. v. United States Dep't of Commerce*, 39 F.4th 756, 772 (D.C. Cir. 2022) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)).

**A.     Rule 53 does not prohibit the Court from allowing out-of-courtroom video and audio broadcasts of this trial to the public.**

To start, this Court has discretion under the Federal Rules of Criminal Procedure (the "Federal Rules") to grant NBC's application. Rule 53 provides: "Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom." The Supreme Court and the D.C. Circuit have explained that federal rules of procedure, like statutes,

should be interpreted according to "their plain meaning." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989); *see, e.g., Warger v. Shauers*, 574 U.S. 40, 44 (2014); *Agudas Chasidei Chabad of United States v. Russian Federation*, 19 F.4th 472, 477 (D.C. Cir. 2021).

Rule 53's terms are clear and straightforward: they prohibit the "taking of photographs in the courtroom during judicial proceedings" and the "broadcasting of judicial proceedings from the courtroom." Fed. R. Crim. P. 53. Rule 53 does not prohibit the Court from authorizing NBCU News Group to use a single pool camera to cover the trial, relay that feed to the studios of NBCU News Group and other media outlets outside the courtroom, and then disseminate that live feed to the public from those studios. Dictionary definitions confirm that the ordinary meaning of the word "broadcasting" is to "make widely known," such as transmissions to the public "by means of radio or television or by streaming over the Internet." "Broadcast," *Merriam-Webster*, https://tinyurl.com/yeyrcdt5; *see Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 871 (10th Cir. 2014) (collecting more definitions). Rule 53 only prohibits "broadcasting" where the broadcast itself originates from the courtroom and is transmitted to the public directly from the courtroom; transmitting video from a pool camera to media outlets is not itself a "broadcast."

Moreover, Rule 53 on its face does not prohibit the Court from using its own equipment to create a live feed of criminal proceedings, allowing NBCU News Group and other media outlets to access that live feed or recording, and authorizing NBCU News Group and other media outlets to disseminate that live feed or recording to the public. So long as no broadcast is made "from the courtroom," Rule 53 does not prohibit it—or even address it. Because the rules are silent, there is no basis to infer a prohibition that the law does not create.

Regardless, the plain meaning of Rule 53 also does not prohibit the Court from authorizing NBCU News Group to use a single pool camera, or the Court's own equipment, to create a video

and audio recording of this proceeding and then to broadcast that recording to the public after a short delay. Again, Rule 53's terms restrict only one kind of broadcasting: broadcasting "from the courtroom." Fed. R. Crim. P. 53. The "straightforward negative inference" is that Rule 53 does not restrict the broadcasting of judicial proceedings from *outside* the courtroom. *Jones v. Hendrix*, 599 U.S. 465, 477–78 (2023). Reading Rule 53 to restrict broadcasts from outside the courtroom of video and audio recordings of court proceedings would effectively delete the phrase "from the courtroom" from the Rule. That reading conflicts with the "well-established principles of statutory interpretation" that require courts to "give[] effect to all of [Rule 53's] provisions." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009); *see, e.g., Johnson v. United States*, 544 U.S. 295, 310 (2005) (rejecting interpretation that would "read out of the statute" limiting language).

In fact, no version of Rule 53 has ever prohibited broadcasting from *outside* the courtroom. The original version of the rule provided that "[t]he taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting *from the court room* shall not be permitted by the court." Fed. R. Crim. P. 53 (1944) (emphasis added). Rule 53 has been amended only once since then, in 2002. Its amended terms, which no longer single out radio broadcasts, now impose a prohibition on any "broadcasting from the courtroom." But under the plain language of the Rule, broadcasting a criminal proceeding is prohibited only "from the courtroom"—meaning when the broadcast is disseminated from the courtroom simultaneously with the events of the proceeding that are being broadcast.

This textual focus on broadcasting only "from the courtroom" makes sense given Rule 53's animating purpose. When the Rule was first adopted in 1944, there was a significant concern that "the tools of the news media trades" would "inherent[ly]" create "distractions" if criminal

8

proceedings were broadcast from the courtroom. *United States v. Cicilline*, 571 F. Supp. 359, 362 (D.R.I. 1983); *see, e.g., In re Mack*, 126 A.2d 679, 693 (Pa. 1956) (Musmanno, J., dissenting) (describing a notorious 1935 criminal trial that devolved in a "circus-like atmosphere" where "photographers leap[ed] about like acrobats, while flash bulbs exploded"). In *Estes v. Texas*, 381 U.S. 532 (1965), for example, the Supreme Court held that a live radio and television broadcast—where "[c]ables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table"—led to "considerable disruption" that deprived a criminal defendant of the "judicial serenity and calm" guaranteed by the Due Process Clause. *Id.* at 536.

Out-of-courtroom broadcasts do not present those same concerns, as the Supreme Court later made clear. In *Chandler v. Florida*, 449 U.S. 560 (1981), the Court explained that *Estes* does not stand for the principle that video and audio coverage are inconsistent with a fair trial. The out-of-courtroom broadcast in *Chandler* involved "[v]ideotaping equipment" that was "remote from the courtroom" and restrictions that kept the proceedings free from distractions such as "artificial lighting." *Id.* at 566. Already by 1981, "many of negative factors found in *Estes*—cumbersome equipment, cables, distracting lighting, numerous camera technicians—[were] less substantial factors" in affecting judicial proceedings. *Id.* at 576. And the potential for distraction has only further decreased over time. Today, the technology necessary to record the events of this historic trial can be made virtually invisible to the participants, operated remotely to avoid any need for video or audio technicians to work in person, and require no artificial lighting, microphones, wiring, or any other equipment that could clutter the courtroom or distract from the gravity and solemnity of the proceedings. Declaration of Marc Greenstein ("Greenstein Decl.") ¶¶ 5–6. In fact, this Court already has capabilities in this regard and uses them to provide an audio/video feed

to the courthouse media room. *See* District Court Media Room, U.S. District Court for the District of Columbia, https://tinyurl.com/2ndrbyxf (accessed Oct. 11, 2023).

Text, history, and purpose all support a narrow reading of Rule 53 that applies only to broadcasts of judicial proceedings "from the courtroom" itself. Because Rule 53 draws the line at broadcasts from the "courtroom," this Court should also interpret this District's Local Rules to go no further. Local Criminal Rule 53.1.1 prohibits the "taking of photographs and operation of tape recorders inside the United States Courthouse and radio or television broadcasting from inside the courthouse during the progress of or in connection with judicial proceedings." Like Rule 53, Local Criminal Rule 53.1.1 has an "inside the courthouse" restriction for broadcasts. Unlike Rule 53, it also prohibits "tape recorders." But Local Rule 53.1.1 should be interpreted only as a rebuttable presumption that permits this Court to allow live feeds of criminal proceedings to be broadcast from outside the courtroom or, at minimum, broadcasting of video recordings of the trial after a short delay, consistent with Rule 53. That approach would accord with the D.C. Circuit's analysis in a similar situation involving a different Federal Rule of Criminal Procedure and a related Local Rule of this District. Federal Rule 6(e)(5) provides that proceedings ancillary to a grand jury hearing should be closed "to the extent necessary to prevent disclosure of matters occurring before a grand jury," while Local Rule 302 provides that "[a]ll hearings on matters affecting a grand jury proceeding shall be closed." The D.C. Circuit explained that, even though it was possible to read Local Rule 302 as requiring the closure of all ancillary hearings regardless of whether they would disclose grand jury matters, the court "seriously doubt[ed]" that reading and suggested that Local Rule 302 required only an *initial* closure, subject to opening the proceedings to the public to the extent the district court determined that public access would not jeopardize secret grand jury material. *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 501 (D.C. Cir. 1998).

So too here:  although Federal Rule 53 and Local Rule 53.1.1 limit live broadcasts directly from the courtroom, they should not be read to prevent out-of-court broadcasts based on a live feed from the Court or recordings by the Court itself or a pool camera.

**B.      Rule 53 and the Court Reporter Act authorize the Court to create a video and audio recording of trial proceedings.**

Even if Rule 53 generally restricted a live video and audio feed during criminal proceedings, that bar does not apply if "otherwise provided by a statute or these rules." Fed. R. Crim. P. 53.  An on-point statute does provide otherwise—namely, the Court Reporter Act.

In the Act, Congress required a verbatim record of "all proceedings in criminal cases had in open court" to be created by "shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge." 28 U.S.C. § 753(b).  The Act also grants district courts discretion to use an electronic record—including an "electronic sound recording"—as either "original records" (which are "the public records of the court") or as the backup to the reporter's live transcription of proceedings. *Id.*; *see, e.g.*, *United States v. Cannon*, 987 F.3d 924, 946 (11th Cir. 2021); *Shabazz v. Lynaugh*, 974 F.2d 597, 597 n.2 (5th Cir. 1992) (per curiam) (observing that videotape "is superior to the audiotape" and "a sufficient record of the proceedings").

This District's Local Rules confirm that this Court has discretion to permit "the use of electronic or photographic means for the presentation of evidence *or the perpetuation of a record*." Loc. Crim. R. 53.1.1 (emphasis added).  And if this Court orders this trial to be recorded on video and audio as authorized by statute and the Local Rules, there can be no conflict with the D.C. Circuit's rule forbidding visitors to "make audio or video recordings" in the courtroom. D.C. Cir. Elec. Devices Policy.

11

When the drafters of the Federal Rules sought to regulate recordings (as opposed to photography or live broadcasts), they did so directly. Other Federal Rules do specifically address whether a "suitable recording device" may be used to record criminal proceedings under various circumstances. *E.g.*, Fed. R. Crim. P. 5.1(g); Fed. R. Crim. P. 58(e). And as the Supreme Court has explained, where statutes use different terms in different places, the courts should "understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*)." *Bittner v. United States*, 598 U.S. 85, 95 (2023) (citing *Dep't of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015)). This context—that the Federal Rules refer to "recordings" when the drafters intended to speak to that subject, and do not do so when the drafters did not intend—confirms that Rule 53 prohibits photography and broadcasts from the courtroom, not recorded feeds broadcast from network studios outside the courtroom.

If nothing else, this Court should exercise its discretion to elect for the use of video and audio as the official record of proceedings. As the Supreme Court has explained, "what transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947). "Openness" of criminal trials also "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*). And here, authorizing video and audio of this criminal trial will ensure maximum "public scrutiny"—a profound public interest in any trial, and an especially weighty one here. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) (*Press-Enterprise II*); *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569–74 (1980) (plurality op.); *Washington Post v. Robinson*, 935 F.2d 282, 287–88 (D.C. Cir. 1991). A transcript that strips out the context of the proceedings, leaving only the bare words on a cold page, cannot guarantee that would-be observers will be able to understand, evaluate, and accept the events and

result of this proceeding. Especially in light of Mr. Trump's questioning of the integrity of these proceedings, as the Special Counsel has set forth in various filings (*e.g.*, Dkts. 57, 64), only an audiovisual record of the events of the trial will be able to ensure public confidence in the fairness of these proceedings and the evidence on which the verdict will eventually rest.

  This Court should also promptly make the audiovisual recording of this trial available to the public. Such official records would be subject to the presumptive First Amendment and common-law rights of access to judicial records. *See Press-Enterprise II*, 478 U.S. at 13 (holding that the public had a First Amendment right to access transcripts of criminal proceeding); *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980) (recognizing an "always strong presumption in favor of public access" to judicial records in federal criminal proceedings); *see also* Loc. Crim. R. 53.1.1 ("[c]ontents of official tapes that are made as part of the record in a case will be treated in the same manner as official stenographic notes"); *Smith v. U.S. Dist. Court Officers*, 203 F.3d 440, 441–42 (7th Cir. 2000) (when video or audio recording is "the original (rather than merely a backup) record of a stage in the proceedings," the public "has a right of access" to those records). Given the widespread public dissemination of many of the facts of this case—through congressional and impeachment hearings, public statements by Mr. Trump and other high-ranking executive-branch officials, and the many prosecutions related to January 6 that are already occurring, it is hard to imagine much if any information that would need to be kept secret. But this Court would of course have authority to withhold from public access portions of the proceedings as required by the defendant's right to a fair trial, national security interests, witness safety, or other issues raised by particular testimony to the extent any such issues arise. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 602–03 (1978).

There is precedent for such release of video recordings of a federal trial, albeit from the civil context. In the landmark cases that resulted in Proposition 8—which had banned same-sex marriage under California law—being struck down as unconstitutional, the Supreme Court stayed the district court's order that allowed real-time streaming of the civil trial because it concluded that the Northern District of California's local rules banned the dissemination of the proceedings. *Hollingsworth v. Perry*, 558 U.S. 183, 191–92 (2010) (per curiam). But the district court still permitted the video recording of the trial and, while the recordings' release was delayed by a legal battle not relevant here, the videos were ultimately released by the court and are now available online to the public. *See US District Court Northern District of California*, YouTube, https://tinyurl.com/2p8ym664 (accessed Oct. 11, 2023); *see also Perry v. Newsom*, 18 F.4th 622, 629–30 (9th Cir. 2021), *cert. denied sub nom. Hollingsworth v. Perry*, 143 S. Ct. 301 (2022).

In the past, two district courts have refused to allow the public access to video and audio recordings produced under 28 U.S.C. § 753(b), reasoning that "ready access to the sound recordings" could "result[] in the functional equivalent of a broadcast of the court proceedings in violation of Rule 53." *United States v. McVeigh*, 931 F. Supp. 753, 755 (D. Colo. 1996); *accord In re Sentencing*, 219 F.R.D. 262, 265 (E.D.N.Y. 2004). These thinly reasoned and unpersuasive decisions extend Rule 53 to prohibit not just "broadcasting from the courtroom" but also any "functional equivalent" of such a broadcast. Nothing in the Rule or the interests that animate it require such an extension. The opposite is true: those decisions effectively rewrite the Rule by ignoring its cabining clause that prohibits only broadcasting "*from the courtroom.*" Fed. R. Crim. P. 53 (emphasis added). And those decisions also are based on perceived concerns about courtroom decorum and disruption that no longer exist. *See supra*, at 9–10.

14

C.     **The canon of constitutional avoidance supports NBCU News Group's interpretation.**

At the very least, inclusion of the phrase "from the courtroom" in the text means that the correct interpretation of Rule 53 is open to debate. The canon of constitutional avoidance thus counsels for adopting the narrow reading set out above and resolving the issue in NBC's favor. The "'canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts.'" *Fed. Express Corp.*, 39 F.4th at 772 (quoting *Fox Television Stations*, 556 U.S. at 516). It is not necessary to determine "whether . . . constitutional arguments would actually win the day": if "one reading" of statutory text "presents a significant risk that [constitutional provisions] will be infringed," the constitutional avoidance doctrine instructs courts to adopt a "narrow interpretation" of the text. *Sandvig v. Barr*, 451 F. Supp. 3d 73, 89 (D.D.C. 2020). Courts regularly invoke the canon of constitutional avoidance in the face of First Amendment challenges. *See id.* ("Plaintiffs' First Amendment challenge raises such" "significant risk[s] that [constitutional provisions] will be infringed" "and thus weighs in favor of a narrow interpretation under the avoidance canon"); *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (finding it "unexceptional" to apply the "constitutional avoidance canon" to avoid a First Amendment challenge to a regulation). The Supreme Court also reiterated just last Term that a court's "task is to seek harmony, not to manufacture conflict," when a law "and the Constitution brush up against each other." *United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023).

This cardinal interpretive principle calls for a narrow reading here. There is "serious constitutional doubt[]," *Fed. Express Corp.*, 39 F.4th at 772, that the First Amendment would allow a complete ban on live video feeds of criminal trials broadcast from outside the courtroom or, failing that, on audiovisual recording of criminal trials broadcast to the public after a short

15

delay. Indeed, such a restriction would fail under any applicable level of First Amendment scrutiny. *See infra*, at 16–31. The courts that extended Rule 53 beyond its plain text—to video or audio in addition to photography and broadcasts, and to out-of-court broadcasts that courts called the "functional equivalent" of in-court broadcasts—never adequately grappled with the serious constitutional conflicts manufactured by that interpretation. Such "serious constitutional doubt" calls for the Court to adopt a construction of Rule 53 that avoids it. Although NBCU News Group has offered the best reading of Rule 53, it is certainly no worse than "at least 'fairly possible.'" *Hansen*, 143 S. Ct. at 1946. The Court should therefore interpret Rule 53 narrowly to prohibit only a broadcast of proceedings disseminated "from the courtroom" while the proceedings are in progress.

*      *      *

For these reasons, this Court should authorize audiovisual coverage of the trial, either because Rule 53 does not apply or because 28 U.S.C. § 753(b) creates an exception.

## II.   A ban on creating and disseminating video and audio of criminal trials would be a content-based restriction that, as applied here, cannot satisfy strict scrutiny.

This Court should adopt the reading of Rule 53 set out above as the best and most sensible reading of the text. But if Rule 53 prohibits the creation and public distribution of video and audio of this trial, that restriction would violate the First Amendment as applied to this trial. Any content-based restriction on speech is presumptively unconstitutional and passes constitutional muster only if it can survive the exacting strict scrutiny standard, meaning the government must show that the restriction is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). There is no compelling government interest advanced by a prohibition on the creation and dissemination of video and audio of this trial. And even if there were, such a prohibition applied to this trial is not remotely tailored to serve any such interest, particularly

because this Court can eliminate any disruption and guard against any specific risks. This Court accordingly should interpret Rule 53 to avoid this constitutional collision or else hold that any prohibition on NBCU News Group disseminating video or audio of this trial to the public is unconstitutional as applied here.

A.   **A ban on creating and disseminating video and audio of criminal trials is a content-based restriction.**

Constitutional rights of the highest order are at stake in this application. The "free discussion of governmental affairs" is at the core of the First Amendment's protection. *Mills v. Alabama*, 384 U.S. 214, 215 (1966). Uninhibited discussion of public affairs is precisely "the kind of speech the First Amendment was primarily designed to keep within the area of free discussion." *New York Times Co. v. Sullivan*, 376 U.S. 254, 296–97 (1964) (Black, J., concurring); *see also Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (noting "that the First Amendment is intended to protect" "uninhibited, robust, and wide-open debate" (quoting *Sullivan*, 376 U.S. at 270)). In this context, then, the rights to free speech and access share the "common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers*, 448 U.S. at 575; *accord Washington Post*, 935 F.2d at 287 ("The first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed.").

Judicial proceedings involving Presidents implicate these interests like few others. Both Congress and the courts have recognized the public's unique interest in directly observing video of proceedings involving current and former presidents. In 1998, Congress released President Clinton's videotaped grand jury testimony during the Starr investigation, only one month after the testimony was taken. *See Presidential Grand Jury Testimony*, C-SPAN (Aug. 17, 1998), https://tinyurl.com/yjyyfeud; *Nation Views Clinton's Taped Testimony Before Grand Jury*, L.A.

Times (Sept. 22, 1998), https://tinyurl.com/2twswaus.  And when President Reagan testified via videotaped deposition in the criminal trial of John Poindexter, a court in this District not only permitted the screening of the deposition to the news media ahead of the trial, but later permitted the physical release of the tapes after the jury had a chance to see them.  *United States v. Poindexter*, 732 F. Supp. 165, 170 (D.D.C. 1990); *see also* Sandra D. Jordan, *Classified Information and Conflicts in Independent Counsel Prosecutions: Balancing the Scales of Justice After Iran-Contra*, 91 Colum. L. Rev. 1651, 1698 (1991).

This time, the former President himself is on trial for alleged conduct while he held the office of the presidency, so the need for the most direct, immediate public access to the proceedings possible is at its zenith.  Americans—and history—should not lose the chance to see video of this watershed trial, which involves alleged conduct going to the heart of our democracy.  Declaration of Rebecca Blumenstein ("Blumenstein Decl.") ¶ 12.  But if Rule 53 were interpreted to prohibit video and audio coverage of this trial, it would strike a blow to core First Amendment interests. There is no question that disseminating courtroom video and audio constitutes speech under the First Amendment.  *See, e.g., Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (holding that the act of making a recording "to facilitate speech that will follow" is "a step in the 'speech process'"); *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.").  The Supreme Court has observed that "[l]aws enacted to control or suppress speech may operate at different points in the speech process."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010).  Here, a blanket ban on video and audio coverage of this trial restricts speech based on its content at multiple points.

*First*, and most obviously, such a ban would restrict one kind of content (video and audio of these proceedings) while allowing a different kind of content (transcripts, written notes memorializing these proceedings, and written and oral descriptions of them). That restriction discriminates between speech based on its content. Video and audio contain content that cannot be obtained from a written transcript: "One cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access." *ABC, Inc. v. Stewart*, 360 F.3d 90, 99–100 (2d Cir. 2004); *cf. United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022) (holding that "transcripts of a trial are not an adequate substitute for access to the courtroom to observe the trial" under Sixth Amendment). This content distinction—the obvious differences between reading something written down and seeing it for yourself—is precisely why factfinders receive deference on aspects of the trial experience like evaluating the credibility of witness testimony: a factfinder sees and hears the proceedings and thus "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). The same is true for the difference between allowing the public to read about the events of a trial and allowing the public to see and hear a criminal trial unfold. Not even the best reporting in the world can capture the actual events that unfold during trial the way video and audio access can. Blumenstein Decl. ¶ 11.

*Second*, any categorical prohibition on video and audio of this criminal trial would be a content-based restriction because no such sweeping ban exists for civil proceedings and other courthouse activities. This District's local rules allow the broadcasting and recording of "investiture, ceremonial, [and] naturalization proceedings." Loc. Crim. R. 53.1.1; Loc. Civ. R. 83.1. In *Reed*, the Supreme Court made clear that "a speech regulation targeted at specific subject

matter is content based even if it does not discriminate among viewpoints within that subject matter." 576 U.S. at 169. Rule 53, if interpreted as a total ban, would impose a content-based restriction on its face under *Reed*: a recording of a federal court proceeding would be illegal if it depicts a criminal proceeding, but could be legal if it depicts a civil proceeding or judge's investiture. *See id.* at 170–71 (treating "event based" distinction as content discrimination). This interpretation of Rule 53 treats broadcasts and recordings differently depending on the substance of the proceedings that they depict—on its face, a content-based restriction that must undergo strict scrutiny. *Reed*, 576 U.S. at 164; *cf. City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022) (treating regulation as content neutral because the speech's "substantive message itself is irrelevant to the application of the provisions").

*Third*, even if Rule 53 were facially content neutral under *Reed*, it would still trigger strict scrutiny because it was "designed to impose a specific, content-based burden on protected expression." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). The government has been clear in the past: a ban is motivated by a concern about what trial participants will say during the proceedings, and about how viewers and listeners will respond to true speech—namely, the video and audio of criminal trials. The government has argued, and some courts have agreed, that it is appropriate to bar "television coverage" of criminal proceedings because the effect "on trial participants is 'still the subject of sharp debate.'" *United States v. Hastings*, 695 F.2d 1278, 1283 (11th Cir. 1983). The government also has justified bans on disseminating video and audio of court proceedings based on fears about the public's reception and use of this content.[2]

In other words, the government has sought to prevent the public from seeing and hearing trial proceedings because it believes that this speech is risky or bad. That is the essence of a

---

[2] As discussed below, these interests are neither compelling nor substantial in this case, and therefore do not satisfy either strict or intermediate First Amendment scrutiny. *See infra*, at 23–27, 29.

content-based restriction, because a regulation is content neutral only if it can be "justified without reference to the content of the regulated speech." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). Consistent with this fundamental First Amendment principle, courts allowing televised arguments have rejected reliance on "the perceived inability of the public to grasp such information," *Marisol A. v. Giuliani*, 929 F. Supp. 660, 661 (S.D.N.Y. 1996), or critiques of "editorial judgments by journalists," *Katzman v. Victoria's Secret Catalogue*, 923 F. Supp. 580, 587 (S.D.N.Y. 1996).

Core First Amendment principles establish that "the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–04 (1984). For that reason, the courts have "been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions"—even when "gross and repugnant in the eyes of most." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988). In the tort context, the Supreme Court has maintained a "longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience." *Id.* at 55; *cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth. The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.") (citation omitted). The rule should be no different when the government seeks to use its regulatory power to prohibit speech rather than its judicial power to punish speech after the fact—the First Amendment does not authorize the state to determine what speech is good for the public and what speech is bad.

All three of these features—the singling out of video and audio, the different treatment for criminal trials, and the purpose to suppress speech that the government perceives as undesirable— distinguish a ban on video and audio of criminal trials from a time, place and manner restriction subject only to intermediate scrutiny. Before the Supreme Court's leading decisions refining its test for content neutrality, a few circuits prohibited the broadcasting of criminal trials under Rule 53 without addressing whether such a ban would be content based. *Conway v. United States*, 852 F.2d 187, 188 (6th Cir. 1988) (per curiam); *United States v. Edwards*, 785 F.2d 1293, 1295 (5th Cir. 1986) (per curiam); *United States v. Kerley*, 753 F.2d 617, 620–21 (7th Cir. 1985); *Hastings*, 695 F.2d at 1282. Yet Rule 53, if interpreted broadly, does not merely regulate *when*, *where*, or *how* a news organization covers and disseminates the content of trial proceedings, but also *what* content can be disseminated and the fundamental understanding that the American public and future generations will have of the trial. *Reed*, 576 U.S. at 165–66; *Sorrell*, 564 U.S. at 563– 65; *cf. McCullen*, 573 U.S. at 479–80. It is no answer to say that NBCU News Group and other news organizations can still speak about the trial using only a transcript or their reporters' notes and observations. Rule 53, if interpreted to prohibit the video and audio coverage of this trial, is a content-based restriction subject to strict scrutiny.

**B.      As applied here, a ban on creating and disseminating video and audio of this criminal trial does not satisfy strict scrutiny.**

Under strict scrutiny, "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. A ban on creating and disseminating video and audio of criminal trials does not satisfy either of these criteria.

1.   **A ban does not serve a compelling interest.**

In the past, courts have sought to justify such a prohibition based on the interest in "preserving order and decorum in the courtroom." *Hastings*, 695 F.2d at 1283. Perhaps at one point in time, recording a criminal trial required 12 camera operators, extensive video and audio equipment installation, "[c]ables and wires . . . snaked across the courtroom floor," and significant other disruption. *Estes*, 381 U.S. at 536. But technological progress did not stop in 1944 when the Supreme Court first promulgated a rule addressing criminal trial broadcasts or in 1965 when it decided *Estes*. The Court itself acknowledged that those "negative factors" had already become "less substantial" *by 1981*—more than forty years ago. *Chandler*, 449 U.S. at 576. And other courts have since remarked that video and audio coverage of trials can be accomplished through "small microphones" and "one small, stationary camera, which makes no noise" and "can be operated by remote control"—equipment that was "no more distracting in appearance than reporters with notebooks or artists with sketch pads." *E.g.*, *Katzman*, 923 F.Supp. at 582. This concern about courtroom decorum is now entirely irrelevant because video technology can be made invisible to the trial participants and operated with no interruption or distraction of any kind. Greenstein Decl. ¶¶ 4–6.

Courts have also expressed concerns that televised proceedings threaten the defendant's and government's interest in "a fundamentally fair trial." *Hastings*, 695 F.2d at 1283. No one questions the importance of this interest. But it is not a compelling basis for prohibiting video and audio coverage in every case. Decades ago, Justice Harlan predicted that "the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process." *Estes*, 381 U.S. at 595 (Harlan, J., concurring). That day has long since arrived. All but four states allow for audio or video broadcasting of trial-court proceedings, including criminal trial

proceedings. A federal district judge described how states had studied the role of cameras in their

courts:

> Numerous studies have been conducted by these jurisdictions to test the impact of the cameras on the proceedings. The results have been favorable—that televised coverage does not impede the fair administration of justice, does not compromise the dignity of the court, and does not impair the orderly conduct of proceedings. Indeed, the opposite is the case[.]

*Hearing before the Committee on the Judiciary House of Representatives*, 110th Cong. on H.R.

2128 ("Sunshine in the Courtroom Act of 2007") (2007) (testimony of Honorable Nancy Gertner

of the United States District Court for the District of Massachusetts); *see also Katzman*, 923 F.

Supp. at 586 (observing that studies showed that "a silent, unobtrusive in-court camera can

increase public access to the courtroom without interfering with the fair administration of justice").

State courts routinely allow the broadcasting of criminal trials, finding that "the coverage

by broadcast media from the public courtroom will not deny the defendant his right to a fair trial."

*People v. Santiago*, 712 N.Y.S.2d 244, 247 (N.Y. Monroe Co. 2000) (declaring unconstitutional

New York statute that prohibited broadcasts of state criminal proceedings); *see also, e.g., State v.

Arias*, 462 P.3d 1051, 1058 (Ariz. Ct. App. 2020) (affirming murder conviction even in light of

"extensive" "trial publicity"); *State v. Smart*, 622 A.2d 1197, 1207 (N.H. 1993) (affirming murder

conviction and rejecting argument that allowing media into the courtroom denied defendant a fair

trial); *Diehl v. Commonwealth*, 385 S.E.2d 228, 232 (Va. Ct. App. 1989) (upholding use of cameras

in murder trial because defendant did not show cameras "deprived him of an impartial jury, or in

any way impaired the fairness of the trial"); *State ex rel. Cosmos Broadcast. Corp. v. Brown*, 471

N.E.2d 874, 881 (Ohio Ct. App. 1984) (issuing writ directing trial court to allow coverage of

murder case and explaining that trial courts cannot assume that coverage would "compromise the

possibility of a fair trial or otherwise impair the dignity of the proceedings"). As one vivid example,

the criminal trial of former Minneapolis Police Department officer Derek Chauvin for the murder

of George Floyd was widely broadcast with no disruption to the proceeding or impact on the defendant's rights—and significantly enhanced the ability of the public in Minneapolis and throughout the world to follow and understand that high-profile proceeding. *See, e.g.*, Matt Sepic, *Chauvin trial eases concerns of courtroom camera skeptics*, MPR News (Apr. 29, 2021), https://tinyurl.com/bdwd4rcu.

That the vast majority of states have found a way to reconcile First Amendment speech interests with the right to a fair trial is a strong indication that no compelling interest supports a ban on video and audio coverage of federal criminal trials. *Cf. Janus v. American Fed. of State, County, and Mun. Employees, Council 31*, 138 S. Ct. 2448, 2485 n.27 (2018) (explaining that Illinois had no need to "force nonmembers to subsidize public-sector unions" because they could follow "the model of the federal government and 28 other States"). Televising this federal criminal trial poses no greater risk to the proceeding's fairness than televising state criminal trials.

In this case, any concern about the fair trial rights of the defendant is also assuaged by the fact that Mr. Trump's defense team has indicated he does not oppose televising the trial. His counsel said, "I personally want the public to see what is going on in this country right now . . . . I want the public to see what kind of prosecution is going on, and I want the public to see the evidence." *Trump lawyer: I personally want cameras in courtroom*, CNN (Aug. 6, 2023), https://tinyurl.com/ve94dvvh. In fact, a Georgia state court has announced its intent to broadcast the trial of the former President and other defendants on closely related charges there. Jozsef Papp, *Fulton judge says Trump court proceedings will be televised*, Atlanta Journal-Const. (Aug. 31, 2023), https://tinyurl.com/53sm9ntd. Even if a ban on video broadcasts here would serve some government interest—it would not—the fact that the criminal trial of this defendant regarding similar allegations will be televised to the world effectively nullifies those considerations. The

prospect of the Georgia trial streaming live on televisions in every airport and every living room while this trial proceeds almost invisibly could not possibly serve a compelling interest.

Federal courts also proved their ability to broadcast criminal proceedings without any harmful consequences during the COVID-19 pandemic. In March 2020, the Judicial Conference of the United States authorized video and teleconferencing for certain criminal proceedings in district courts under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). 15 U.S.C. § 15002(b)(1). At least some courts—including courts in this District—took up that permission and allowed the public to access criminal trials remotely by audio. *United States v. Barrow*, 2021 WL 3602859, at *6 (D.D.C. Aug. 13, 2021) (noting that district court "maintained a public telephone line for members of the public to call and listen to the [criminal] proceedings"); *see also, e.g.*, *Allen*, 34 F.4th at 793 (noting that the district court provided public "access to the proceedings only by streaming audio over the internet"); *In re Order Extending Use of Video and Telephone Conferencing Under Exigent Circumstances*, 2021 WL 1165147, at *1 (D. Vt. Mar. 26, 2021) (extending authorization for the use of "video and telephone hearing in criminal cases" and noting that video attendance was "available to members of the media and members of the public upon request"). The Supreme Court, the D.C. Circuit, and other federal courts of appeals allow live-streaming, video, or audio broadcasts and recording of oral arguments in criminal cases. And even before the pandemic, federal courts often permitted broadcasting of civil proceedings. *E.g.*, *Capitol Records, Inc. v. Alaujan*, 593 F. Supp. 2d 319, 323 (D. Mass. Jan. 14, 2009); *In re Zyprexa Prods. Liab. Litig.*, 2008 WL 1809659, at *1 (E.D.N.Y. Mar. 4, 2008).

In short, NBCU News Group and the public have a paramount interest in broadcasting (and the public a paramount interest in witnessing) this trial of a former President. No compelling

interest, as applied here, supports a ban on video and audio coverage of federal criminal trials, as proved by the experience of 46 states and of federal courts during the COVID-19 pandemic.

### 2.    A ban is not narrowly tailored to any compelling interests.

A flat ban on video and audio coverage of federal criminal trials also is not narrowly tailored to the asserted interests in maintaining courtroom decorum or protecting the fairness of the proceedings.  Such a content-based speech restriction could withstand First Amendment scrutiny only if it were "the least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478.  But less restrictive alternatives already exist—and are already in place—to protect these purported interests.

Start with courtroom decorum.  Permitting one unobtrusive pool camera operated and shared by news organizations would not risk any disruption of the courtroom or the proceedings. Greenstein Decl. ¶¶ 4–6.  If the Court declines to permit a pool camera, it could allow news organizations to take a feed from the courthouse's own audiovisual equipment, which this Court has already used in this case for the in-courthouse media room.  *See* Public and Media Advisory, U.S. District Court for the District of Columbia (Aug. 10, 2023), https://tinyurl.com/2h7uwre9. The Court may also impose reasonable, content-neutral regulations on access to and use of video and audio.  *See, e.g.*, *Smart*, 136 N.H. at 655 (recounting that "the trial judge specifically instructed the media regarding what it could and could not do inside and outside the courtroom").  As to the concern that trial participants might grandstand for the cameras, a ban on video and audio is overinclusive (because this Court can impose penalties for any attorney, party or witness misconduct) and underinclusive (because "newsworthy trials are newsworthy trials [that] will be extensively covered by the media both within and without the courtroom" regardless of any cameras in the courtroom).  *Petition of Post-Newsweek Stations, Fla., Inc.*, 370 So. 2d 764, 776 (Fla. 1979).  And in any case, banning cameras in the courtroom will do nothing to prevent trial

participants or anyone else from characterizing and commenting on the proceedings—it will just guarantee that members of the public have no ability to see the proceedings for themselves and draw their own informed conclusions.

A wholesale ban on video or audio is also not the least restrictive means of guaranteeing a fair trial.  Concerns related to jurors, witnesses, or specific evidence with a particular risk of threatening a fair trial can be addressed by witness- or evidence-specific measures such as redaction, not showing jurors and certain witnesses, or withholding sensitive sections of video until the trial concludes. *See, e.g., Poindexter*, 732 F. Supp. at 169–70 (releasing taped deposition of President Reagan following redaction of sensitive information).  As discussed below, the decision to withhold any such information from the public should require a significant justification involving specific findings on the record that withholding the information is required to protect witness safety, avoid risk to national security, or a comparable interest. *See infra*, at 32–33.  But there is no doubt the Court has ample available "safeguards that will protect the first amendment rights of the press and the public, without unduly interfering with the workings of the judicial process." *Washington Post*, 935 F.2d at 289.

A content-based ban on video and audio coverage of criminal trials does not satisfy strict scrutiny as applied here.  Such a categorical bar does not actually advance any meaningful government interests.  And even if concerns about courtroom decorum and the trial's fairness could support narrower speech restrictions, a blanket ban is not remotely tailored to advance such interests.  The conclusion, then, is clear:  This Court should hold that Rule 53, as applied to this trial, violates the Constitution or else should be interpreted to avoid such constitutional peril. *See supra*, at 15–16.  Either way, the profound First Amendment interests at issue in this historic proceeding strongly counsel for the Court's authorization to create and disseminate video and

audio here.  No other outcome can guarantee that the millions of citizens with an interest in this trial can see and weigh for themselves the process and evidence that produces the ultimate verdict in these historic and unprecedented proceedings.

III.    **At minimum, Rule 53 is a time, place, and manner restriction that does not satisfy intermediate scrutiny as applied here.**

Even if this Court concludes that Rule 53 is not content based, then at a minimum the rule is subject to intermediate scrutiny under the First Amendment.  NBCU News Group acknowledges that several circuits—though not the D.C. Circuit—have upheld Rule 53 under this level of scrutiny in nonbinding decisions.  *E.g.*, *Kerley*, 753 F.2d at 622; *Hastings*, 695 F.2d at 1284.  But those decisions are unpersuasive and misapplied the First Amendment's tailoring requirement.

Rule 53, even if it is a content-neutral restriction, must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  As discussed above, Courts have identified courtroom decorum, the trial's fairness, and distraction of trial participants as the main interests supporting Rule 53.  *See, e.g.*, *Hastings*, 695 F.2d at 1282.  Those interests are no doubt legitimate in the abstract.  But even under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994).  For all the reasons set out above, a ban on video and audio coverage of federal criminal trials plainly serves no significant government interest and is not truly necessary to protect the integrity of judicial proceedings.  NBCU News Group is aware of no conviction that has been overturned because cameras were allowed in the courtroom in the last 50 years.

A blanket ban on video and audio coverage also "burden[s] substantially more speech than is necessary to further [those] legitimate interests." *Ward*, 491 U.S. at 799. Such a ban flatly prevents dissemination of video and audio of the trial even when the district court can craft safeguards to maintain courtroom order through unobtrusive means, ensure the trial's fairness, prevent grandstanding by trial participants, and protect witnesses and jurors through targeted limitations such as withholding sensitive testimony from the public record and concealing jurors' identities. Less restrictive alternatives clearly exist because state courts have routinely (and successfully) adopted measures short of an across-the-board prohibition. *See, e.g., In re WMUR Channel 9*, 813 A.2d 455, 460 (N.H. 2002) (remarking "that trial judges can maintain the decorum of highly-publicized trial proceedings and guarantee a defendant's right to a fair trial by working with the media to place guidelines on their coverage, instructing the jury on the nature of such media coverage and maintaining control of the courtroom"). In other words, real-world evidence from many state courts proves that Rule 53 is not "narrowly tailored to effectuate" its interests— even assuming any government interests were "sufficient to satisfy the significance and content-neutrality elements of the time, place, or manner test," a categorical ban would not be "narrowly tailored to effectuate it." *Initiative and Referendum Inst. v. U.S.P.S.*, 417 F.3d 1299, 1307 (D.C. Cir. 2005).

Nor does Rule 53 leave "ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. Again, trial transcripts "are not an adequate substitute" for observing the trial because they "'cannot capture the sweaty brow, the shifty eye, [or] the quavering voice" and do not "reflect what was communicated by the testifying witness.'" *Allen*, 34 F.4th at 796 (quoting *In re Schoenfield*, 608 F.2d 930, 935 (2d Cir. 1979)). A mere audio record, though better than a transcript, also deprives the public of critical information about the trial. "Although a listener may

be able to detect vocal inflections or emphases," she will be left in the dark as to "the trial participant's demeanor and body language," as well as "the judge's attitude," "the reactions of the jury to a witness's testimony," and "any visual exhibits." *Allen*, 34 F.4th at 796.

## IV.    The Court should exercise its discretion to permit video and audio coverage of this historic trial.

For all the foregoing reasons, there is no restriction limiting the Court's discretion to control its courtroom and to authorize the video and audio coverage of the most important federal criminal trial in American history. The Court should exercise that discretion in favor of video coverage. It is clear that the reluctance of courts to allow video recordings of trials decades ago arose from concerns about how that activity would disrupt the proceedings. *See, e.g., Estes*, 381 U.S. 532. Those concerns are now obsolete. *See* Greenstein Decl. ¶¶ 4–6. And there are no other comparably compelling justifications that could warrant imposing so serious a restraint on First Amendment freedoms as a categorical ban on video and audio of all criminal trials.

Instead, the Court should engage in an ordinary analysis balancing the relevant interests counseling in favor of public access to a criminal trial against whatever specific rationales might justify forbidding video and audio in a particular proceeding. The First Amendment interests arrayed in favor of authorizing video and audio coverage here are profound: "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler*, 485 U.S. at 50; *see also Counterman*, 600 U.S. at 78 ("[T]he First Amendment is intended to protect" "uninhibited, robust, and wide-open debate"). That proposition is the foundation of "[o]ur political system and cultural life"; any government restriction that "stifles speech on account of its message" serves to "contravene[]" the most basic of American rights. *Turner*, 512 U.S. at 641. As the Supreme Court has explained, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable

to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339 (cleaned up).

Extraordinary though it is, those principles, ordinarily invoked about proposed legislation or electioneering, apply even more strongly to this criminal trial—because this criminal trial is unlike any other in the past, without any parallel in American history until now. It is not just that a former President is the defendant; not just that he is charged with crimes arising from his conduct in office; not just that his federal criminal trial will unfold alongside his candidacy to run once again for the nation's highest office. Most serious of all, the charges in this trial allege that the former President sought to use the powers of his office and his stature as a public figure to usurp the democratic process and remain in power even when he knew he had lost his re-election bid and thereby—as the President—conspired to defraud the United States. *E.g.*, *United States v. Trump*, No. 23-cr-257-TSC, Dkt. 1 at ¶¶ 2–4.

No criminal trial could more seriously warrant the Court's exercise of its discretion to authorize video than this one. The events that happen before this Court during the trial are "public property." *Craig*, 331 U.S. at 374. The events of these proceedings will be the most public any criminal trial has ever been, and what happens in this trial may prove just as essential—or more— to the public's choice of Chief Executive in 2024 as the content of any debate or any stump speech. The public interest in following this trial will be extraordinary, too. And while it is likely that very little evidence in this proceeding would warrant redaction or delayed release due to the already-public nature of the underlying conduct (as publicized in the prior impeachment proceeding and Congressional hearings addressing these same allegations), the Court retains its discretion, as always, to manage its courtroom and withhold or delay some of that information from public view

based on specific findings on the record justifying such action. *Cf. Press-Enterprise I*, 464 U.S. at 510; *Washington Post*, 935 F.2d at 287–88 ("The trial court must articulate specific findings on the record demonstrating that the decision to seal the plea agreement is narrowly tailored and essential to preserve a compelling government interest").

In short, Rule 53 cannot survive constitutional scrutiny as applied to this criminal trial—perhaps the most important trial ever for American democracy, and thus where the public has the greatest interest in seeing and hearing the proceedings. And the Court has—and should exercise—the discretion to authorize video and audio coverage of these proceedings so the public can see these proceedings in real time, or as close to it as possible. "[T]here is more to be gained than lost by permitting electronic media coverage of judicial proceedings subject to standards for such coverage." *Post-Newsweek Stations*, 370 So. 2d at 780. And there are no risks in this matter that cannot be mitigated (or eliminated) by procedural orders regulating the conduct of trial proceedings.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, this Court should (1) permit NBCU News Group to create a video and audio record of the March 2024 trial of former President Donald J. Trump via a pool camera and to broadcast it with only the limited delay necessary for this Court to assess whether compelling public interests justify withholding any portion of the video and audio recording from the public for a limited time; (2) alternatively, provide a live feed of this trial to NBCU News Group and other news outlets and authorize them to disseminate it to the public; or (3) at minimum, create a video record of this trial for historical purposes that will be released to the media and the public with minimal delay.

## MEET AND CONFER CERTIFICATION

Counsel for NBCU News Group conferred by email on October 9, 2023 with counsel for the United States and counsel for Defendant Donald Trump. Counsel for the United States informed counsel for NBCU News Group by email on October 10, 2023, that the United States opposes this application. Counsel for Defendant had not responded as of this filing.

Dated: October 11, 2023

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
Patrick J. Fuster (C.A. Bar. No. 326789)*
Milagros R. Villalobos Navas (C.A. Bar. No. 324909)*
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071-3197
Tel: (213) 229-7804
tboutrous@gibsondunn.com
pfuster@gibsondunn.com
mvillalobos@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-2459
cssullivan@gibsondunn.com

Gail Gove (N.Y. Bar No. 4338976)*
Erik Bierbauer (N.Y. Bar No. 3057148)*
Adam Lazier (N.Y. Bar No. 5396254)*
**NBCUNIVERSAL MEDIA, LLC**
30 Rockefeller Plaza
New York, NY 10112-0015
gail.gove@nbcuni.com
erik.bierbauer@nbcuni.com
adam.lazier@nbcuni.com

*Attorneys for Applicant NBCUniversal Media, LLC*

**Pro Hac Vice Applications Forthcoming*

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October 2023, I caused true and correct copies of

the foregoing to be served via electronic mail and FedEx overnight delivery.

Elizabeth Shapiro
J.P. Cooney
Molly Gulland Gaston
Thomas Windom
Leslie Vigen
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

*Counsel for the United States*

John F. Lauro
Filzah I. Pavalon
Lauro & Singer
400 N. Tampa Street
15th Floor
Tampa, FL 33602
Todd Blanche
Blanche Law
99 Wall Street
New York, NY 10005

*Counsel for Donald J. Trump*

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (# 420440)

35